[Cite as *State v. Bennington*, 2023-Ohio-644.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29585 |
| | : | |
| v. | : | Trial Court Case No. 22CRB00330 |
| | : | |
| KIMBERLY L. BENNINGTON | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on March 3, 2023

. . . . . . . . . .

JOHN D. EVERETT, Attorney for Appellee

GARY C. SCHAENGOLD, Attorney for Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Kimberly L. Bennington appeals from her conviction in the Kettering Municipal Court after she was found guilty of violating a protection order, a first-degree misdemeanor. For the reasons that follow, the judgment of the trial court will be affirmed.

## I.     Facts and Procedural History

{¶ 2} In March 2022, the children of V.C.M. were in the temporary custody of her friend and neighbor, Emilee Tobias, after Bennington reported to Children Services that V.C.M.'s children were being abused and/or neglected. Bennington mistakenly believed that the Children Services-instituted safety plan prohibited V.C.M. from having contact with her children. According to trial testimony, however, that was not the case; V.C.M. could have contact with her children as long as Tobias was present.

{¶ 3} Around that same time, a civil stalking protection order was issued by the Montgomery County Common Pleas Court, prohibiting Bennington from having any contact with V.C.M. and her minor children. The protection order included a provision that prohibited Bennington from using any form of electronic surveillance on the protected parties.

{¶ 4} On March 16, 2022, V.C.M., her children, and Tobias were leaving Tobias' house to get slushies at Speedway (Tobias was transporting the children and V.C.M. was driving a separate car) when V.C.M. noticed Bennington sitting in her vehicle across the street; it appeared that Bennington had her phone out and was taking pictures. Believing this to be a violation of the protection order, V.C.M. called Kettering police, and Officer Timothy Kim was dispatched to investigate. He was familiar with the strife between the women as he had dealt with them before.

{¶ 5} According to trial testimony, Bennington followed V.C.M. to Speedway and continued to surveil her and the children from a nearby coffee shop. V.C.M. recounted that she went into the store to get the slushies and, when she returned to her car,

Bennington was still there with her phone out. V.C.M. stayed at the scene until Officer Kim arrived. Officer Kim testified that he drove around the area surrounding Speedway but could not locate Bennington, so he instructed V.C.M. to return home, and he would meet with her there to collect more information.

{¶ 6} Upon arriving back at V.C.M.'s house, Officer Kim collected a witness statement from V.C.M. and confirmed that there was an active protection order which had been served on Bennington. A short time later, Bennington arrived at her residence across the street from V.C.M. Officer Kim quickly made contact with her and asked if she had taken pictures or videos of V.C.M. or her children. Initially Bennington denied taking pictures or following V.C.M. to Speedway, but after gaining consent to look at Bennington's phone, Officer Kim found pictures of V.C.M. and the children in a "deleted pictures" or "trash" folder. The photos had been taken that day and depicted V.C.M. and her kids in the Speedway parking lot. Bennington was arrested for violating a protection order.

{¶ 7} The case proceeded to a bench trial on July 6, 2022. Bennington testified that she was a licensed social worker and a "mandated reporter" under R.C. 2151.421. Because of that, Bennington testified, she had contacted Children Services to report that she "felt like the [V.C.M.] children were in danger" because V.C.M.'s boyfriend "had broken her nose and fractured her cheekbone." Trial Tr. at 37. Bennington believed that because V.C.M. chose to stay with her boyfriend, it was her duty as a mandated reporter to inform Children Services. Bennington's reporting led to V.C.M.'s entering into the voluntary safety plan that brought Tobias into assuming temporary responsibility for the

children.

{¶ 8} Bennington also told the court that she was familiar with the initial safety plan put in place by Children Services. She believed that, according to the plan, V.C.M. could have no physical contact with her children, though FaceTime was permitted.

{¶ 9} According to Bennington's trial testimony, on the afternoon of March 16, 2022, she was on her way to pay a bill at the Chase bank on Woodman Avenue when she saw V.C.M. and Tobias (who had the children in her car) drive by. Thinking that this was a violation of the safety plan, she followed the cars, took pictures, and sent them to V.C.M.'s case manager. The case manager, then, informed Bennington that the safety plan had been modified to allow contact between V.C.M. and her children.

{¶ 10} Ultimately, Bennington was found guilty of violation of a protection order, in contravention of R.C. 2919.27. The court imposed a 90-day jail sentence, with 89 days suspended, and gave Bennington credit for one day served. A $250 fine ($200 of which was suspended) was imposed, and Bennington was placed on one year of unsupervised probation. The trial court then stayed the sentence pending the outcome of this appeal.

## II.    Violation of a protection order

{¶ 11} In her lone assignment of error, Bennington argues that the trial court erred in finding her guilty of recklessly violating a protection order. While not expressly stated, we interpret this assignment of error as asserting that her conviction was against the manifest weight of the evidence.

{¶ 12} When an appellate court evaluates whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the

evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except "'in the exceptional case in which the evidence weighs *heavily* against the conviction.'" (Emphasis added.) *Id.*

{¶ 13} Bennington appears to concede that the actions she took on March 16, 2022, violated R.C. 2919.27. She admits, and the evidence showed, that Bennington followed V.C.M. and her children to the Speedway station and then took pictures of them. This violated the protection order against her. Nevertheless, Bennington argues that as a mandatory reporter, she was duty-bound to do so.

{¶ 14} R.C. 2151.421 promulgates an extensive list of mandatory reporters who are required by statute to report instances of suspected child abuse and/or neglect. Both sides agree that as a social worker, Bennington's profession is one of the classes of vocations required to report. Where they differ, though, is on whether Bennington was required to report in this instance. We conclude that she was not and that she cannot use being a mandated reporter as a defense in this case.

{¶ 15} According to R.C. 2151.421(A)(1)(a), "[n]o [mandatory reporter] *who is acting in an official or professional capacity* and knows, or has reasonable cause to suspect * * * that a child under eighteen years of age * * * has suffered or faces a threat

of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child shall fail to immediately report[.]" (Emphasis added). The plain language, as emphasized above, notes that only professionals who are *acting in their official or professional capacity* are duty-bound to report the suspicion or knowledge of abuse and/or neglect. This concept has been highlighted by cases from several of our sister districts.

{¶ 16} In *State v. Simms*, 7th Dist. Columbiana No. 05-CO-4, 2005-Ohio-6934, a child disclosed abuse to her mother, a registered nurse (a mandatory reporter), who in turn told a friend, who was also a nurse. The *Simms* court found that neither adult was required to report the allegations because the victim's mother was acting as a parent, not a professional, when she learned of the abuse. Similarly, the mother's friend was acting as just that – a friend – when the mother confided in her.

{¶ 17} Similarly, in *State v. Walker*, 6th Dist. Lucas No. L-04-1112, 2006-Ohio-4637, the defendant was victimizing young children. When the parents of the first victim discovered the abuse, they went to their neighbor's house (that of a Toledo police officer) to let him know – as their neighbor and friend – what had happened to their child and to warn him to be vigilant with his own. The neighbor was off duty and at his home when the conversation occurred. The Sixth District concluded that the officer "was acting as a neighbor and private citizen when approached by the parent of the first victim regarding her allegations. The parties were all friends and neighbors. The conversation took place while the [officer] was at his private home. He was not acting in an official capacity on behalf of the Toledo Police Department." *Id.* at ¶ 23. The officer had no duty to report

because he was not acting in his official capacity.

{¶ 18} The same analytical framework applies here. Bennington testified that she was on her way to the bank to pay a bill when she saw V.C.M. and Tobias drive by. At that point, she suspected that V.C.M.'s safety plan was being violated, so she took it upon herself to follow them and then take pictures of them in the Speedway parking lot. There is no evidence in the record from which to conclude that Bennington was acting in an official or professional capacity when she followed V.C.M. and took pictures of V.C.M. and her children.

{¶ 19} Further, there is nothing in the record that demonstrates that Bennington believed the children were in danger of or actually suffered harm as required by the statute. She simply saw them drive by and assumed that V.C.M. was violating her safety plan.

{¶ 20} Finally, even if she were a mandatory reporter in this scenario, her actions went above and beyond what the law requires. R.C. 2151.421 compels only that the mandatory reporter *report* the suspected abuse, not investigate it. "The authority and responsibility to conduct such investigations and submit the necessary reports are vested solely in the county department of human services or the children services board, in cooperation with law enforcement agencies." *Brodie v. Summit Cty. Children Servs. Bd.*, 51 Ohio St.3d 112, 117, 554 N.E.2d 1301 (1990). *See also State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, ¶ 39, quoting *State v. Clark*, 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592, ¶ 85 (O'Connor, C.J., dissenting) ("What the [reporting] statute requires is actually quite minimal: when teachers, or others who are

required to report, encounter suspected abuse or neglect in their official capacity, they must report it. In turn, the children's services agency or the police – not the mandatory reporters – are responsible for investigating[.]"). If Bennington suspected abuse and/or neglect, she simply should have called V.C.M.'s case worker, whom Bennington apparently knew. Following and then taking pictures of V.C.M. and her children stepped over the line. Bennington had no legal authority to investigate her suspicions or do anything beyond contacting the authorities.

{¶ 21} Bennington further argues that even if she was mistaken about her duty to report, she should have immunity because she made the report in good faith. We disagree. As relevant here, R.C. 2151.421(H)(1)(a)(i) states that any person shall be immune from civil or criminal liability for injury, death, or loss to person or property that otherwise might be incurred or imposed *as a result* of providing information used in a report or providing information in good faith used in a report. According to the statute, a person is only immune from liability if his or her good faith report caused injury, death, or loss to person or property. In this case, there is no evidence of injury, death, or personal/property loss as a result of Bennington's report and thus, immunity is not available. Because of that, Bennington's alleged good faith was irrelevant.

{¶ 22} Having determined that Bennington did not qualify as a mandated reporter in this case because she was not acting her official or professional capacity and that she did not have immunity under R.C. 2151.421(H)(1)(a), we turn briefly to whether her conviction was against the manifest weight of the evidence. After carefully reviewing the entire record, we cannot conclude that the trial court clearly lost its way and created such

a manifest miscarriage of justice that the conviction must be reversed. There is no dispute that Bennington followed and then took pictures of V.C.M. and her children in violation of the active protection order against her. Hence, we conclude that this is not the exceptional case in which the evidence weighed heavily against the conviction. Bennington's assignment of error is overruled.

### III.     Conclusion

{¶ 23} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and LEWIS, J., concur.